**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FRANCINE YVETTE MITCHELL,** | : | **Case No. 1:03CV2179** |
| | : | |
| **Plaintiff,** | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | **MEMORANDUM AND ORDER** |
| **CITY OF CLEVELAND,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

On October 24, 2003, Francine Mitchell ("Mitchell" or "Plaintiff") filed this action against

the City of Cleveland ("City" or "Defendant") and various unknown officers for injuries she sustained

while being detained in Cleveland's First District Jail.  On September 23, 2004, this Court granted

Plaintiff's motion to amend her complaint so that she could expressly name the individual officers

involved.  On October 18, 2004, the City filed a Motion for Summary Judgment.  For the reasons

outlined further below, the Defendant's Motion for Summary Judgment is **GRANTED** in Part and

**DENIED** in Part.

### I.    FACTUAL BACKGROUND

On February 5, 2003, at approximately 9:00 p.m., Warren Mitchell, an autistic young male,

left his home on foot to call his mother's boyfriend. He went to a payphone in front of the Little Giant

Eagle located at the corner of East 93rd Street and Dickens Street in Cleveland, Ohio.  Warren's

mother, Francine Mitchell ("Mitchell" or "Plaintiff"), after realizing he was missing, left their home in her car and tracked him to the Little Giant Eagle payphone. Mitchell performed a "talk-down" in order to persuade Warren to enter her car.  A talk-down is a process Mitchell uses to calm Warren. Once the talk was over, Warren entered her car and sat in the passenger's seat.

At that point, a police car pulled up behind her.[1]  The officers, over the police car's loud speaker, commanded Mitchell and Warren to put their hands on the dashboard of the car.  While Mitchell's and Warren's hands were on the dashboard, an officer opened the passenger door and pulled Warren from the seat by his shirt.  The other officer commanded Mitchell to keep her hands on the dashboard while Warren begged the officers to stop "hassling" him.  Next, the officer asked Warren where he put the "rocks."  Warren, the autistic child, not familiar with the officers use of slang, immediately bent down and picked up some "rocks" from the ground.  The officer slapped the rocks out of Warren's hands, slammed him onto the police car, wrestled him to the ground, handcuffed him, and placed him into the back of the police car.

As Mitchell watched her son being handcuffed, she reached into the backseat of her car for her walking cane.  The officer reprimanded her for moving around in the car.  The officer then questioned Mitchell about her conversation with Warren.  Mitchell explained that Warren was her

---

[1] As outlined in its Motion for Summary Judgment, the Defendant's view of the facts surrounding the stop and arrest of Mitchell differ from Mitchell's account of the events.  The City contends that Cleveland Police Officers stopped Mitchell for running a red light at or near the intersection of East 93rd Street and Mount Auburn in Cleveland, Ohio. The officers issued Mitchell a traffic citation for running the red light and not wearing a seat belt.  When Mitchell refused to sign the ticket, the officers arrested her and took her to the First District Jail.  Because there are material disputes of fact regarding these events, the Court assumes, for purposes of the current motion only, that Plaintiff's rendition of the facts is true. The City does not refute, or deny, any of the factual allegations made by Plaintiff pertaining to police brutality, physical abuse and treatment, and/or misconduct towards Mitchell or her son, Warren.

2

son, his condition, and the talk-down process.  The officer, however, did not believe her and insisted Warren was a crack dealer.  The officer persistently asked Mitchell where the crack was that she had just purchased.  At that time a local shop owner came to the scene and told the officers that he knew Mitchell and Warren and confirmed that Warren was Mitchell's son.  The officer, however, continued to question Mitchell about drugs.  She continued to tell the officer that she did not have any.  At this point, the officer asked Mitchell to provide her driver's license and proof of insurance, which she then gave to the officer.  The police officers then asked her to step out of her car.  Mitchell stepped out of the car and the officers escorted her to the police car.

Once Mitchell was in the police car, the officers returned to her car to conduct a search.  When the search was complete, an officer approached Mitchell and told her he was going to write her a ticket for running a red light.  Mitchell refused to sign the ticket.  The officer threatened that if she did not sign the ticket, she would be taken to jail and it would be the "worst night of her life."  Mitchell still refused to sign the ticket.  The officer then placed Mitchell under arrest.  When Mitchell told Warren to give her car keys to the shop owner, the officer intervened.  He picked up Warren, slammed him into the police car, and took the car keys away from him.

The officers took Warren to the Fourth District jail on charges of resisting arrest, delinquency, and obstruction of justice.  He was released five hours later.[2]  The officers drove Mitchell to the First District jail.  The officers escorted Mitchell, aided by her cane, into the First District jail.  The arresting officers placed Mitchell into the custody of the institutional guards ("IG's") of the First District jail.

---

[2] No complaint of either excessive force or false arrest has been asserted on behalf of Warren Mitchell.

Inside the jail, a male guard told Mitchell to remove her shoelaces. Mitchell explained that, because of her severe medical problems, she could not bend over to remove her shoelaces. A few guards, who overheard the conversation, demanded to know why Mitchell was causing trouble. Unsatisfied with Mitchell's answer, a female guard slammed Mitchell's face against the glass booking window, commandeered her cane, handcuffed her, took her shoelaces out of her shoes, and removed her shoes and socks. The female guard threw Mitchell down and pushed her face into the concrete ground. At this time another guard ordered Mitchell to open her mouth and, when she did not do so, the guard kneed Mitchell in the back several times. On the last time, Mitchell heard a crack in her back causing her to lose feeling in her right leg. In excruciating pain, Mitchell pleaded with the guards to take her to the hospital. The guards ignored her pleas, picked her up off the ground, and placed her in a cell. The guards denied Mitchell's repeated requests to make a phone call.

After being detained for twenty-four hours, the guards finally allowed Mitchell to make a phone call. Mitchell called her mother and requested that she send Mitchell's medication to the jail. Mitchell's mother sent Warren to drop off the medication. Although Warren dropped off the medication, Mitchell never received it.

On or about February 8, 2003, the Cleveland Municipal Court arraigned Mitchell and charged her with failure to obey a traffic-control signal, failure to comply with a lawful order, resisting police officers, and failure to wear a seatbelt. After the arraignment, Mitchell was released from jail. Mitchell went directly to the Metro Health Medical Center Emergency room. The hospital treated her for high blood pressure, caused by her failure to take her medication to control that condition, gave her a shot for her pain, and referred her to Dr. Karetti, her regular physician. When Mitchell saw Dr. Karetti, he treated her for pain and performed a total of two surgeries for injuries sustained by

4

Mitchell during her incarceration at the First District jail.

On February 9, 2003, Mitchell filed a complaint with the Office of Professional Standards ("OPS") based on the physical brutality she endured while incarcerated at the First District jail.  The OPS conducted an investigation and determined Mitchell's allegations to be "unfounded."  On April 10, 2003, the Cleveland Municipal Court found Mitchell guilty on all counts except resisting officers. The municipal court dismissed that charge at the request of the prosecutor.  On October 24, 2003, Mitchell filed this action in federal court against the City of Cleveland and various unknown officers.

## II.    DISCUSSION

### A.    Legal Standard

Under Fed. R. Civ. P. 56( c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Lapointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir. 1993); *Osborn v. Ashland County Bd. Of Alcohol, Drug Addiction & Mental Health Servs.,* 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam).  The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case. *See Lapointe,* 8 F.3d at 378.  The moving party may meet its burden by showing that the nonmoving party lacks evidence to support an essential element of its case. *See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1389 (6th Cir. 1993).  In response, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.,* 886 F.2d

5

1472, 1476 (6th Cir. 1989) *(quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). The Court must view the evidence, all facts, and any inferences that may permissibly be drawn from the facts in light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); *see also Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992).

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party, must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) *(quoting Anderson,* 477 U.S. at 251-52). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247-48 *(*emphasis in original*); see generally Booker v. Brown & Williamson Tobacco Co., Inc.,* 879 F.2d 1304, 1310 (6th Cir. 1989). Thus, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252*; see also Gregory v. Hunt,* 24 F.3d 781, 784 (6th Cir. 1994). Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *See Adams v. Metiva,* 31 F.3d 375, 379 (6th Cir. 1994).

**B.     Analysis**

In its motion, the Defendant seeks summary judgment based on two primary legal theories. First, the Defendant asserts that Plaintiff's federal claims fail because the Defendant is not liable under 42 U.S.C. § 1983 for the unconstitutional actions of its employees under either the theory of

6

*respondeat superior* or by virtue of its allegedly unconstitutional customs or policies.  Second,

Defendant contends that it is immune from state -law-tort claims under R.C. § 2744.02.  The Court

addresses the validity of these arguments below.

### 1.    Federal Claims

Under 42 U.S.C. § 1983,

> "Every person who under color of any statute, ordinance,
> regulation, custom, or usage, of any state ... subjects, or
> causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or
> other proceeding for redress."

There are two essential elements of a § 1983 claim: (1) there must be a deprivation of the plaintiff's

rights, privileges, or immunities secured by the Constitution and laws of the United States; and (2)

the plaintiff must allege that the defendants deprived him of this constitutional right "under color of

any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Dunn v. Tennessee*,

697 F.2d 121, 125 (6th Cir 1982).

There is no doubt that Plaintiff asserted claims and presented evidence of a violation of her

constitutional rights while detained in a city jail facility.  The force described, if it occurred, was

certainly excessive within the meaning of the fourth amendment.[3]  And, the failure to provide needed

---

[3] As a pretrial detainee, Plaintiff's claims of improper treatment are governed by the Fourth
Amendment, and not the Eighth, as would apply to convicted prisoners.

medical attention is similarly actionable.[4]

It is axiomatic that § 1983 does not impose vicarious liability on a municipality for its agents' constitutional torts. *Monell v. Dep't of Social Serv.*, 436 U.S. 658, 691-94, 56 L. Ed 2d 611, 98 S. Ct. 2018 (1978). The doctrine of *respondeat superior*, therefore, is inapplicable in § 1983 actions. *Id.* A municipality is liable for the acts of its employees only where the violation of the plaintiff's constitutional rights stems from a governmental "policy or custom." *Id.* at 694. The official policy or custom "must be the moving force of the constitutional violation in order to establish the liability of a government body under § 1983." *Id*.

Plaintiff first argues that the City is liable because the OPS maintained final policymaking authority over Mitchell's complaint investigation and effectively condoned the behavior of the police officers by not reprimanding any of them. In *Pembaur v. City of Cincinnati,* 475 U.S. 469, 89 L. Ed. 2d 452, 106 S. Ct. 1292 (1985), the Supreme Court held that a municipality can be held liable under § 1983 for a single decision by the municipality's policymakers. *Id.* at 479-80. In order to establish municipal liability for an employee's unconstitutional actions, a policymaker must have final authority to establish policy and has either adopted or condoned the unconstitutional actions through such policy. *Id.* at 481. "The authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable [sic] and are not constrained by the official policies of superior officials." *Waters v. City of Morristown,* 242 F.3d 353, 362 (6th Cir 2001); *see also City of St. Louis v. Praprotnik,* 485

---

[4] Because Plaintiff was convicted of most of the charges for which she was arrested, Plaintiff cannot establish that she was deprived of any constitutional right by virtue of the arrest itself. For this reason, and because Plaintiff does not oppose it, the City's motion for Summary Judgment on Plaintiff's false arrest and false imprisonment claims is hereby **GRANTED**.

U.S. 112, 127, 99 L. Ed. 107, 108 S. Ct. 915 (1988).  To determine whether final authority to make

municipal policy is vested in a particular official, the court must look to state law.  *See Waters*, 242

F.3d at 362.

Officials can derive their authority to make final policy from customs or legislative

enactments, or such authority can be delegated to them by other officials who have final policymaking

authority.  *See Feliciano v. City of Cleveland,* 988 F. 2d 649, 655 (6ᵗʰ Cir. 1993); *see also Pembaur,*

475 U.S. at 483.  This includes "state and local positive law," such as statutes, ordinances, and

regulations, and less formal sources of law such as local practice and custom.  *Feliciano,* 988 F.2D

at 655; *see also Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737, 105 L. Ed. 2d 598, 109 S. Ct.

2702 (1989); *Mandel v. Doe*, 888 F.2d 783, 793 (11ᵗʰ Cir. 1989).

In the instant case, Plaintiff was interviewed by an OPS individual within two weeks of filing

the Complaint form.  During the interview, the Plaintiff described the treatment she received from the

officers while she was incarcerated, and the officers that were involved.  It is undisputed that the OPS

then conducted an investigation in which only some of the officers described by the Plaintiff were sent

forms to fill out describing the events.  Surprisingly, Sergeant Kennedy, the officer in charge of the

First District jail where Plaintiff was incarcerated, was not sent a form to fill out, and furthermore,

was not even questioned regarding Plaintiff's allegations. Once the investigation was finished, no

further action was taken against the officers.

The Plaintiff argues that the OPS decision and its inadequate investigation were final actions

by a policymaker.  Plaintiff is wrong on this point.  The City Charter of Cleveland, reveals that the

OPS is "under the general direction" of the Chief of Police who is, in turn, under the direction of the

Director of Public Safety.  "The City Charter of Cleveland and § 135.09(a) of the Cleveland code,

reveals that the Chief of Police is subordinate to the Director of Public Safety."[5]   *Feliciano,* 988 F.2D at 655.  It is the Director of Public Safety to whom final policymaking authority has been delegated with respect to police matters, including the investigation of allegations of misconduct. *Id.* Given this fact, the Plaintiff must establish that the Director of Public Safety ratified the OPS's actions before she can establish that the City is liable for those actions. *Id.* at 656. In this regard, "[r]atification of a subordinate's action requires more than acquiescence - - it requires affirmative approval of a particular decision made by a subordinate."  *Id.*; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1989).  To survive summary judgment on this issue, therefore, Plaintiff must offer proof that the official charged with making final policymaking authority regarding police behavior (*i.e.*, the Director of Public Safety) <u>expressly</u> <u>approved</u> the OPS decision.  Plaintiff has failed to do so.

Even if Plaintiff could prove that the OPS had final policymaking authority in the area of investigations, or that the Director of Public Safety ratified the OPS's actions in this case, moreover,

---

[5]     The Cleveland Charter provides:

> Under the general direction of the executive head of the police force, the officer or employee in charge of administering the OPS shall cause a full and complete investigation to be made of each complaint with the board.

Cleveland, Ohio Charter § 115-4 (1988).

> "There is established a Division of Police in the Department of Public Safety, to be administered and controlled by a Chief of Police, subject to the provisions of the Charter and ordinances of the City, and to the direction of the Director of Public Safety."

Cleveland, Ohio Code § 135.09(a) (1988).

10

she would still have to prove that the OPS decision was a "moving force" behind her constitutional violation. *Id* at 649 n.6.  Here, the violation she alleges arises from her improper treatment while incarcerated. OPS's investigation occurred after-the-fact.  Plaintiff has neither alleged nor offered evidence establishing that past OPS investigations or no-fault decisions somehow inspired the officers in this case to act inappropriately, or without fear of reprisal.  Indeed, Plaintiff has offered no evidence that the OPS ever investigated complaints regarding jail personnel in the past.  Absent this causal link, no claim of municipal liability could lie.

Alternatively, the Plaintiff alleges that it was the City's failure to properly train its IG's that caused her injuries.  The U.S. Supreme Court has held, "that the inadequacy of police training may serve as the basis for a § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 103 L. Ed. 2d 412, 109 S. Ct 1197 (1989) (emphasis added).  The Court further stated that, "only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality - a policy as defined by our prior cases - can a city be liable for such a failure under section 1983." *Id*. at 389.  A municipality may be liable for inadequately training its employees where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id*. at 390.  To establish municipal liability, "the plaintiff must prove: (1) that a training program is inadequate to the tasks the [municipal employees] must perform; (2) that the inadequacy is the result of the city's deliberate indifference; and (3) that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989).

11

In support of her position, Mitchell argues that certain IG's were unfamiliar with certain jail policies, specifically those policies regarding the treatment of injured or disabled prisoners, the removal of personal property from an uncooperative prisoner, and the administration of medical treatment. In fact, Plaintiff presented deposition testimony that certain officers and IG's were not only unfamiliar with these policies, they were not even aware that any such policies existed. In response, the City of Cleveland proffered some evidence of the training programs completed by the city's officers and IG's. (Doc. 35). The City argues that the officers and IG's completed general police officer training offered by the Ohio Peace Officer Training Commission ("OPOTC"), in addition to some jail training. (Doc. 35). The Affidavit of Jacqueline Lewis broadly states that the program includes "training on the proper use of force and the care of prisoners with medical needs", Lewis Affd. at ¶ 9, though no detail is offered on the extent to which those issues are addressed. Whether the officers were trained according to general minimum standards set forth by the state for police officers is largely irrelevant, however, because Plaintiff's injuries were not the result of her arrest. Rather, Plaintiff's injuries were the result of the behavior of certain IG's during her booking and detention. The question of whether training is adequate must be assessed by considering the extent of "jail training." The Defendants fail to specifically state what "jail training" the IG's received or even to explain what policies were in place for IG's. The Defendants do not describe, for instance, whether and to what extent training was provided to IG's regarding treatment of injured or disabled prisoners, the removal of personal property from an uncooperative prisoner, or the administration of medical treatment. Given that the Plaintiff required two separate surgeries, "[s]uch undisciplined conduct on the part of law enforcement officers speaks ab initio of a lack of training and discipline." *Marchese v. Lucas*, 758 F.2d 181, 188 (6ᵗʰ Cir. 1985). While Plaintiff's showing in response to

12

Defendant's motion for summary judgment is certainly not strong, Defendants bore the burden in the first instance of coming forward with a "well supported" motion under Rule 56. On the question of IG training, they simply have not done so. Accordingly, the Court finds that questions of fact exist regarding the adequacy of the training provided to the IG's, and whether any inadequacies in that training were a moving force behind Plaintiff's injuries.

### 2. State Claims

Defendant argues that it is immune from state-law-tort claims under O.R.C. § 2744.02 since none of the exceptions to political subdivision immunity apply in this case. Plaintiff argues that Defendant is liable under O.R.C. § 2744.03 for reckless and wanton conduct. Plaintiff's claim is without merit.

Under the Political Subdivision Tort Liability Act, O.R.C. § 2744, a three-tiered analysis determines whether a political subdivision is immune from liability for state law claims. First, § 2744.02 (A)(1) sets forth the general rule of immunity:

> "Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death or loss to a person or property allegedly caused by an act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."

Once immunity is established, the second tier of analysis is whether any of the five exceptions to immunity in § 2744.02(B) apply. These include: (1) negligent operation of a motor vehicle by political subdivision employees while in the scope of their employment; (2) negligent performance of acts by employees with respect to proprietary functions of political subdivisions; (3) failure to keep public roadways in repair and free from nuisance; (4) negligence of employees within or on the

grounds of government buildings; and (5) liability expressly imposed on the subdivision by a section of the Ohio Revised Code.  If one of these exceptions apply, the political subdivision loses its immunity shield. Under the third tier of analysis, immunity can be reinstated if the political subdivision can successfully argue that one of the defenses of O.R.C. § 2744.03 applies.[6]

In this case, the City is immune from all state-law-tort claims.  First, the City of Cleveland is a political subdivision under § 2744.02(A) and, therefore, enjoys qualified immunity for state-law-tort claims.  In order to establish the City's liability, the Plaintiff must allege facts to show one of the exceptions under § 2744.02(B) applies.  The Plaintiff has failed to allege in her Complaint or Opposition that any of the exceptions in § 2744.02(B) apply to the City.  Instead, the Plaintiff argues that the City's "[i]mmunity from liability is defeated when there are allegations of reckless and wanton behavior." (Citing O.R.C. § 2744.03(A)(6))(Doc. 24).  This application of the law, however, is incorrect.  Section 2744.03(A)(6) does not apply to political subdivisions.  Instead, O.R.C. § 2744.03(A)(6) clearly states, "In addition to any immunity or defense referred to in division (A)(7) of this section ... the *employee* is immune from liability unless one of the following applies: (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."(emphasis added).  In the present case, only the City of Cleveland, and not the individual officers, moved for Summary Judgment.  Accordingly, and because the City of Cleveland is not an employee under § 2744.03(A)(6), that section is inapplicable.  Accordingly, Plaintiff's state law claims raise no genuine issue of material fact in this case and Plaintiff's state claims against the City

---

[6] The political subdivision defenses under O.R.C. § 2744.03 include: (1) performance of a judicial or legislative function; (2) conduct required by law; (3) conduct required by office; (4) performance of community service by the injured party; and (5) misuse of equipment, supplies, materials, or other like resources.

of Cleveland must be **DISMISSED**.

III.    CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is **GRANTED** in Part and **DENIED** in Part.

Moreover, pursuant to Fed. R. Civ. P. 4(m), which requires that service of process be perfected within 120 days of the filing of a complaint, the Court hereby **ORDERS** Plaintiff to **SHOW CAUSE** why her claims against the individual officers should not be dismissed for lack of prosecution.  Plaintiff shall make such a showing, or perfect service, within ten (10) days of this Order.  Plaintiff's failure to comply with this Order will result in dismissal of her claims against the individual officers only.


        **IT IS SO ORDERED.**

                                        s/Kathleen M. O'Malley
                                        **KATHLEEN McDONALD O'MALLEY**
                                        **UNITED STATES DISTRICT JUDGE**

**Dated:** September 9, 2005